## PROCTER & GAMBLE CO. v. POWELSON.

(Circuit Court of Appeals, Second Circuit. January 5, 1923.)

No. 60.

1. **Joint adventures ⬅5(1)—Partnership ⬅105—Remedy for breach is in equity for accounting.**

In case of partnership or joint adventure agreements, generally the remedy of the complaining partner for breach of agreement by the other is in equity for an accounting and settlement of the partnership affairs, rather than by action for rescission at law.

2. **Joint adventures ⬅5(1)—Remedy for breach held in equity.**

Where the parties to a joint adventure agreement for planting cocoanut land had each sunk $192,500 in the venture, whose financial needs were underestimated, and one party refused to comply with the agreement, held, that the remedy of the other party was not by action at law for rescission, but in equity for accounting.

3. **Joint adventures ⬅5(3)—Question of agreement to pay for services of one joint adventurer held for jury.**

In action by one joint adventurer against the other, evidence in respect to defendant's counterclaim for compensation separately agreed to be paid him for his time and services in investigating the proposition held to raise an issue for the jury.

4. **Joint adventures ⬅5(3)—Claim for salary held for the jury.**

In action by one joint adventurer against the other, evidence in respect to defendant's counterclaim for compensation separately agreed to be paid him for salary for acting in executive charge of the joint enterprice held to raise an issue for the jury.

5. **Trial ⬅11(2)—Transfer of suit to equity held not permissible.**

Where action at law for rescission was brought by one joint adventurer against the other, and after the trial ended, but before judgment, defendant gave notice of motion to transfer the cause to the equity side, under Judicial Code, § 274a (Comp. St. § 1251a), providing that "any party to the suit shall have the right at any stage of the cause, to amend his pleadings so as to obviate the objection that his suit was not brought on the right side of the court," but plaintiff did not ask for such relief, and of the counterclaims set up by defendant only a part of one, involving a comparatively small amount, was cognizable in equity, the motion was properly denied, as such a transfer would require a complete change in the pleadings, which, in turn, would be supported only by substantially different character of testimony.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Procter & Gamble Company against Wilfred V. N. Powelson. Both parties bring error to the judgment entered. Affirmed in part, and reversed in part.

Cross-writs of error to a judgment of the District Court for the Southern District of New York, entered upon the dismissal of plaintiff's complaint and six of defendant's counterclaims, and a directed verdict in favor of plaintiff on two counterclaims. The parties will be referred to as aligned below.

Plaintiff, an Ohio corporation, brought an action at law to recover $192,500 from defendant, a citizen of New York. The complaint alleged that on November 10, 1919, defendant was the owner or controlled the rights

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of one Hyatt, under a concession from the republic of Panama to Hyatt, known as the "Concession Hyatt," wherein the republic agreed to convey to Hyatt 61,861 acres of land in Panama, and that, at the same date, plaintiff and defendant entered into a contract. This contract was called "Outline of Understanding." As the provisions of this contract are vital to an understanding of the rights and relations of the parties, it is quite fully quoted margin.[1]

---

[1]"New York City, N. Y., November 10, 1919.

"Outline of Understanding.

"The Procter & Gamble Company and W. V. N. Powelson have this day agreed to develop jointly a cocoanut plantation on a tract of 5,000 acres of the flat land of the Mandinga Valley, within the limits of the Concession Hyatt, republic of Panama, each assuming the liability to contribute to the enterprise for the purposes of the development on the Isthmus of Panama, $250,000: Provided, however, that if it should require a less sum to plant to cocoanuts said 5,000 acres and to bring them into bearing to a point where the enterprise should become self-sustaining, then Procter and Gamble and W. V. N. Powelson shall each be liable to contribute to the enterprise not more than 50 per cent. of said lesser cost.

"Pending the execution of a formal agreement  *  *  *  defining the legal form that the enterprise shall take,  *  *  *  the enterprise shall be carried on in accordance with the following method of procedure:

"(1) Open bank account No. 1 in the sum of $100,000, in the name of W. V. N. Powelson and a person to be nominated by Procter & Gamble. This account to be subject to checks signed jointly by the above-mentioned persons. Funds to be initially deposited to this account to be furnished forthwith, one-half by W. V. N. Powelson and one-half by Procter & Gamble.

"(2) Open bank account No. 2 in the name of W. V. N. Powelson, 'Agent,' in the sum of $40,000. This account to be drawn from account No. 1 by joint check as above. Expenditures from account No. 2 to be made only for purposes of the Mandinga Plantation enterprise. As expenditures are made, vouchers to be prepared by W. V. N. Powelson and audited by a representative of Procter & Gamble. Upon approval of any voucher or vouchers by the auditor, a deposit to be made from account No. 1 to account No. 2, equal to the amount of the audited voucher or vouchers. Account No. 2 would thus become the working account, through which all bills for the purpose of the plantation enterprise would be paid.

"(3) No expenditures for the enterprise to be made, except from account No. 2.

"(4) The books of account of the enterprise to be kept by Procter & Gamble, and the entries therein showing expenses to be made in accordance with approved vouchers submitted by W. V. N. Powelson, Agent.

"(5) Vouchers submitted by W. V. N. Powelson, Agent, are to be promptly approved by the auditor representing the Procter & Gamble Company,  *  *  *

"(6) When the balance in account No. 1 falls as low as $40,000, both Procter & Gamble and W. V. N. Powelson shall be notified in writing by the auditor, and each shall then be liable to deposit within 15 days to the credit of account No. 1 the sum of $10,000; and this liability to so deposit when the balance in account No. 1 shall be less than $40,000 shall continue until Procter & Gamble and W. V. N. Powelson shall each have deposited to the credit of account No. 1 an aggregate amount of $250,000.

"It is the intent to maintain the balance in account No. 1 at all times at a sum of at least $40,000, and to deposit from this account to the credit of account No. 2 an aggregate total of $500,000, unless a smaller sum is necessary as provided in the initial paragraph hereof.

"It is estimated that the expenditure of $500,000 on the Isthmus of Panama will result in the planting of 5,000 acres of cocoanuts at the rate of approximately 1,000 acres per annum, and it is intended to expend from

The complaint further alleged that 'no other contract was entered into between the parties; that in compliance with its obligations under the contract and its reliance upon defendant's promise under paragraph seventh of the contract, plaintiff paid to defendant a total of $192,500 "for the use of said enterprise," and that this money was expended by defendant in clearing the 5,000 acres, mentioned in paragraph seventh of the "Outline," in planting cocoanut trees, and otherwise developing and otherwise improving the land, and "in connection with said enterprise." It is then alleged that plaintiff on December 20, 1920, formally demanded that defendant should convey the land as per agreement; defendant having refused on December 10, 1920, to convey these 5,000 acres to himself and defendant jointly, or to a corporation as required by the contract. Plaintiff then demanded damages, in the sum of $192,500, with interest.

The answer denied the breach, and set up four affirmative defenses and nine counterclaims, one of which (the ninth) was withdrawn. The defenses need not be set forth, because the plaintiff's case must stand or fall on its own merits, in view of the fact that, at the conclusion of plaintiff's case and before any testimony was adduced by defendant a motion to dismiss was made and granted. The grounds upon which the motion was granted were (1) that the action was, in effect, for rescission, and, as there was no fraud nor mutual mistake in entering into the contract, relief, if any, was in equity for an accounting; and (2) that there was no proof of damages.

The first six counterclaims were dismissed at the conclusion of defendant's case. At the end of the whole case, the court directed a verdict for plaintiff on the seventh and eight counterclaims.

Wing & Russell, of New York City (Philip Russell and Burt D. Whedon, both of New York City, of counsel), for Proctor & Gamble Co.

Davies, Auerbach & Cornell, of New York City (Stephen C. Baldwin, of Brooklyn, N. Y., and Charles H. Tuttle, of New York City, and Bruce Bromley, of Brooklyn, N. Y., of counsel), for Powelson.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). *Plaintiff's Case.* The "Outline of Understanding" (hereinafter called the "Outline") must be construed as a joint venture agreement. It was entered into by both parties in good faith. It is true that defendant's estimate of the money necessary for the development of the enterprise

account No. 2 during the first five years of the life of the enterprise sums approximately as follows:

| | |
|---|---|
| First year | $180,000 |
| Second year | 80,000 |
| Third year | 80,000 |
| Fourth year | 80,000 |
| Fifth year | 80,000 |
| | $500,000 |

"(7) W. V. N. Powelson, as soon as the necessary legal papers can be drawn and the necessary formalities complied with, is to cause 5,000 acres of the flat alluvial land of the Mandinga Valley to be transferred either to the Procter & Gamble Company and W. V. N. Powelson, jointly, or to a corporation or other form of association organized for the purpose of receiving said 5,000 acres in consideration of the issue of all its capital stock. W. V. N. Powelson is to deliver one-half of the capital stock of said corporation, if organized, to Proctor & Gamble in consideration of the receipt of $12,500."

turned out to be too optimistic, but there is no doubt that the preliminary negotiations which led up to the signing of the "Outline" were fairly and honestly conducted by both sides, and, as the District Judge properly held, the "Outline" was entered into without fraud or mistake.

The testimony on behalf of plaintiff in support of its complaint consisted of (1) the "Outline" and (2) letters passing between the parties. It was agreed, at the trial, that each party had paid $192,500 into joint account No. 1. It will suffice to note the essential facts which the correspondence evidenced, without setting forth a mass of detail.

On September 20, 1920, defendant reported to plaintiff at great length in respect of the development of the venture. He stated that, owing to Hyatt's death, there had been delay in obtaining the deed, but that the Panamanian government was ready to "issue a deed" to the Concession Hyatt, as soon as the court would adjudge Hyatt's mother (his sole heir) the owner of the concession, and then Mrs. Hyatt would give a deed to defendant or his nominee. He regretted his inability to transfer at that time the 5,000 acres. "I agreed to transfer," but hoped "within a short time to be able to make the transfer, to our joint account of the 5,000 acres." He made clear, with elaborate detail, that to plant 5,000 acres would require more money than originally estimated. Only 1,300 acres had been cleared for cocoanut culture, and he suggested several courses of action; i. e.: (1) To finish planting the 1,300 acres and "quit additional development"; or (2) plant new areas up to 3,000 acres, which would require more money for upkeep during the nonproductive period; or (3) finish the 5,000 acres, which would, in his opinion, require "an additional $175,000."

On December 10, 1920, defendant wrote plaintiff that he had the deed from the republic of Panama to the San Blas Development Company, a corporation organized under the laws of Panama at the instance of defendant to take title to the land; that he and plaintiff had agreed that the accomplishment of the enterprise was impossible, and he was unwilling to proceed further under the "Outline"; that his proposals for modifying the agreement had been rejected, and that he rejected plaintiff's proposals. He then proposed "a physical division of the property subject to joint ownership," but that the land thus subject would be "no greater in area than the land that can be planted for the $500,000 subscribed pursuant" to the "Outline"—in other words, much less than 5,000 acres.

On December 14, 1920, in answer to the foregoing, defendant wrote plaintiff that "we have not agreed, as you state," that the accomplishment of the enterprise was impossible. Plaintiff further stated in this letter that it was willing, not only to complete its part of the existing subscription, but to put up additional moneys to complete the enterprise, "you [Powelson], of course, to put up your share." Plaintiff continued:

"We claim that the enterprise is entitled to receive a deed of 5,000 acres under" the seventh paragraph of the "Outline."

On December 18, 1920, defendant, in answer to plaintiff's letter of December 14, 1920, wrote:

"I intended my letter to you of December 10th to be notice that I consider that I am under no obligation to proceed further under the 'Outline of Understanding of November 10, 1919.'"

And defendant concluded by stating that a fair division would be to give plaintiff "some 350 acres already planted to cocoanuts." Defendant offered no testimony, but then moved to dismiss.

From the foregoing, it is plain that defendant broke his agreement by failing to comply with the seventh paragraph, and the question is whether plaintiff can recover in a law action $192,500 as damages.

We need not enter into any extended discussion as to when, in considering the law of contracts generally, an action at law may be brought on the theory of rescission. Usually there must be fraud in inducing a party to enter into the contract. Freer v. Denton, 61 N. Y. 492.

[1] When dealing with partnership or joint venture agreements, the general rule is that the remedy of the complaining partner or coventurer is in equity for an accounting and a settlement of the partnership affairs. 30 Cyc. 461, 465. The "Outline" was a New York contract, and the New York courts seem consistently to have held to the principle stated in Hollister v. Simonson, 36 App. Div. 63, at page 65, 55 N. Y. Supp. 372, at page 374 (appeal dismissed 170 N. Y. 357, 63 N. E. 342), where Van Brunt, P. J., said:

"We have been unable to find any rule established by which, because of the misconduct of a partner, his copartner can rescind the agreement of copartnership and recover back his contributions of capital unless such misconduct consisted of gross fraud or gross misrepresentation, by which the plaintiff has been induced to enter into the copartnership, so that there was fraud in the inception of the contract. * * * It seems to us that the learned referee has failed to observe the rule above stated in the conclusion at which he has arrived. He has allowed a recovery in this action as for money had and received upon the ground of rescission, which seems to be an erroneous rule in respect to controversies as between partners. A proper judgment would have been for an accounting as between these partners in respect to their copartnership enterprise, upon which accounting the plaintiff could prove the damages which he had sustained by reason of the misconduct of the defendant Simonson in selling the property in violation of his duties towards his joint adventure."

See, also, Arnold v. Arnold, 90 N. Y. 580; Mitchell v. Tonkin, 109 App. Div. 165, 95 N. Y. Supp. 669; Worms v. Lake, 198 App. Div. 776, 191 N. Y. Supp. 113 (which seems quite in point).

There is an exception to the general rule, in addition to that noted in Hollister v. Simonson, supra, where one partner assumes wrongfully to dissolve a partnership before the end of the term. In such circumstances, the aggrieved partner has an action at law, as in Bagley v. Smith, 10 N. Y. 489, 61 Am. Dec. 756, and Zimmerman v. Harding, 227 U. S. 489, 33 Sup. Ct. 387, 57 L. Ed. 608.

[2] In the case at bar, no such situation was presented. There is still another class of cases, where an action at law will lie for the breach of an agreement to furnish capital (Bates on Partnership, vol. 2, p. 918; Story's Equity Jurisprudence [14th Ed.] § 903); but the test always is whether the covenant, the breach of which is complained of, can be separated from the joint venture. Here the "Outline" and its practical construction by the parties contemplated the transfer of

the property to the enterprise. The total contribution of $385,000 had resulted in planting only 700 acres of cocoanut land, and, as the correspondence shows, a large amount of money was expended in machinery, buildings, labor, etc., preliminary to clearing and planting. Both parties have thus sunk $192,500 each in a venture whose financial needs, as so often happens, were underestimated. The case is plainly one for an accounting, and it may be that, as an incident to or part of the relief to which plaintiff may be entitled, a court of equity may decree the performance of the seventh paragraph.

In any event, there is no evidence of damage, and the District Judge was right in holding that there had been "no basis whatever laid for any award of damages" against plaintiff personally.

*The First Six Counterclaims.* Defendant's first counterclaim alleges in substance that it was found that the venture was incapable of accomplishment with the original capital; that, after what had been expended, plaintiff refused to contribute any additional moneys to preserve the assets of the enterprise; and that as a result the assets are rapidly deteriorating, and their value has been greatly diminished, and therefore defendant has been damaged in the sum of $192,500.

Defendant's second counterclaim alleges, in substance, the foregoing in another way, and demands the same damages.

Defendant's third counterclaim alleges, in substance, that after it had been ascertained that the enterprise could not be carried on with the original capital, plaintiff agreed to go ahead with the development of the cocoanut plantation regardless of cost, and to advance all of the additional money needed for this purpose, and that plaintiff failed to carry out this agreement, to the damage of defendant in the sum of $3,117,500.

Defendant's fourth counterclaim alleges, in substance, that, after it was found that the joint venture could not be accomplished with the capital originally agreed upon, plaintiff and defendant mutually agreed to stop further expenditures and to try to sell the assets of the joint venture, and to distribute the money received therefrom, and that plaintiff thereafter refused to carry out this agreement, to the damage of the defendant in the sum of $692,500.

Defendant's fifth counterclaim alleges, in substance, that the land upon which the cocoanut trees were to be planted was obtained from the government of Panama under the Concession Hyatt, which concession required certain work to be done; that plaintiff and defendant agreed at the time of entering into the joint enterprise that the terms of the concession should be carried out with the funds of the joint venture; that, after it was discovered that the agreement could not be carried out with the capital originally agreed upon, plaintiff refused to permit the joint venture to carry out the terms of this concession, and insisted that defendant should do this himself, to the damage of defendant in the sum of $1,027,500.

Defendant's sixth counterclaim alleges, in substance, that in the latter part of the year 1920 plaintiff refused to proceed under the original agreement, unless defendant would deliver a deed to certain property and a surety bond, and that upon defendant's refusal to perform these

acts plaintiff refused to go on with the joint venture, to the damage of defendant in the sum of $192,500.

From the outline of the case, supra, it is apparent that defendant has not made out a case at law on the first, second, fifth, and sixth counterclaims, whatever, if any, upon different pleadings, may be his rights in equity. We find it unnecessary to extract from this voluminous record the details of the testimony by which defendant sought to sustain the third and fourth counterclaims. It is sufficient to state (1) that, as matter of law, there was no evidence in support of these counterclaims which raised an issue of fact; and (2) that the court's rulings in excluding certain documents under the third counterclaim were right.

[3] *Eighth Counterclaim.* Defendant alleged, in substance, that by an agreement separate from the "Outline" plaintiff would pay defendant one-half of the expenses incurred by defendant in making investigations into the cocoanut plantation proposition prior to the date of the "Outline" and one-half of the reasonable value of his time and services from January 1, 1919, and that such reasonable value should be computed at the same rate as the value which might be fixed by plaintiff as the reasonable value of the services rendered by defendant for the year November 10, 1919, to November 10, 1920. The amount claimed by defendant as still due was $11,813.27.

Mr. McCaw was senior vice president of plaintiff and substantially in charge of the negotiation with defendant which led up to the execution of the "Outline." Defendant testified that on November 10, 1919, after the "Outline" had been signed, he called to the attention of Mc-Caw a letter to plaintiff dated November 3, 1919, in which defendant suggested that he be reimbursed for his expenses and compensated for his time "in pursuing the investigations that led up to putting the proposition in its present shape," and be compensated for the time he might "devote to the enterprise after it is launched." After some talk, Mc-Caw mentioned compensation at the rate of $10,000 a year for past and future services, but this was not satisfactory to defendant. Finally, according to defendant, the following conversation occurred.

"Now, I will go ahead, and I will work for this enterprise for one year, and at the end of that year you can call me in, and you can tell me what, in your judgment, is a fair compensation for what I have done, and that is the compensation I will apply to that year and to the back work, which you have no means of knowing about, because you did not observe it. He said, 'Nothing could be fairer than that, Mr. Powelson; that is satisfactory.' Then I said, 'About the expenses?' And he said, 'Yes, we will share the expenses fifty-fifty. How much are they?' I said, 'They are around $3,000 or $3,500. He said, 'That will be all right.' I think that is the substance of what I recall."

On October 8, 1920, there was a conference between McCaw and defendant. McCaw, according to defendant, said:

"Your services, in my judgment, are worth more money, but in view of your willingness to take into consideration the fact that this enterprise is not going to be so successful as originally contemplated, I have fixed your compensation at the rate of $25,000 a year, you to pay half of it to yourself, and we to pay you $12,500."

288 F.—20

McCaw then asked whether that would be satisfactory, and defendant said it would be. There was discussion as to how the $25,000 should be paid, and there is a conflict upon that point in the testimony. The importance of the conflict lies in the fact that, if the jury took defendant's view, then it might find the $12,500 was an obligation of plaintiff, but, if it took McCaw's view, then it would find to the contrary.

The method of bookkeeping would also probably become an important factor. The point is that the testimony of defendant and of McCaw raised an issue of fact as to whether or not plaintiff had agreed, outside of the "Outline," personally to pay defendant $12,500 for the year November 10, 1919, to November 10, 1920. If the agreement was as defendant testified, then automatically his compensation from January 1, 1919, to November 10, 1919, was at the rate of $25,000 per annum, half of which plaintiff was obligated to pay. Thus, as there was an issue of fact as to the eighth counterclaim, it should have been submitted to the jury, and it was error to direct a verdict in favor of defendant as to this counterclaim.

[4] *Seventh Counterclaim.* Part of this counterclaim is for the reasonable value of services from November 10, 1920, to December 2, 1920, the amount claimed by defendant for services from November 20, 1919, to November 20, 1920, having been paid. In addition to the arrangement described supra, defendant testified that on October 8, 1920, McCaw and he agreed that defendant "would continue in executive charge of the enterprise, the salary to be determined as in the past" by plaintiff. This testimony was, in effect, denied by McCaw. Thus there should have been submitted to the jury these questions (1) whether there was an agreement; (2) if so, whether it was at the $25,000 per annum rate; or (3) if to be fixed by plaintiff, irrespective of that rate, then what was the reasonable value of the services. It was therefore error to direct a verdict in respect of this part of the seventh counterclaim.

The other part of the counterclaim was for one-half of two-thirds of the cost to defendant of maintaining his New York office from November 10, 1920, to December 2, 1920. Defendant testified to a conversation with Stanley, representing plaintiff, the effect of which was that the enterprise should bear two-thirds of the expenses of maintaining Powelson's office. We do not find any promise on Stanley's part that plaintiff would personally pay any of these expenses. The claim of defendant in respect of the moneys expended to maintain his New York office was a claim, if any, against the joint venture, and not against plaintiff, and the court, therefore, was right in directing a verdict in favor of plaintiff on this part of the seventh counterclaim.

[5] The final contention in the case is that the action should have been transferred to the equity side of the court in pursuance of section 274a of the Judicial Code (Comp. St. § 1251a).[2] The trial ended on

---

[2] Section 274a of the Judicial Code: "In case any of said courts shall find that a suit at law should have been brought in equity or a suit in equity should have been brought at law, the court shall order any amendments to the pleadings which may be necessary to conform them to the proper

January 24, 1922, and it was not until February 24, 1922, that defendant gave notice of a motion to transfer the cause to the equity side. In view of the fact that judgment had not been entered, defendant relies upon that part of the statute which provides that:

"Any party to the suit shall have the right at any stage of the cause to amend his pleadings so as to obviate the objection that his suit was not brought on the right side of the court."

Plaintiff has not asked for this relief, and has preferred to stand or fall on its action at law. The court cannot compel plaintiff to bring a suit in equity. American Mills Co. v. American Surety Co. of New York, 43 Sup. Ct. 149, 67 L. Ed. ——, decided December 11, 1922, affirming (C. C. A.) 273 Fed. 68.

Of all of the counterclaims set up by defendant only a part of the seventh counterclaim is cognizable in equity. This part of the seventh counterclaim refers to a very small amount incidentally involved in what otherwise might prove to be an elaborate accounting, involving a very substantial sum of money and a great mass of detail. To render a just and comprehensive decree, it is necessary to examine all of the transactions and accounts of the venture, and it might well be that in stating these accounts the expenses referred to in the seventh counterclaim might merely be set off against sums which might be found to be due to plaintiff. We are of opinion that it was never intended under section 274a, supra, that a plaintiff, who brings an action at law against which defenses at law are interposed and counterclaims at law set up, should obtain a transfer of the cause to the equity side merely because an incidental and minor part of a joint venture account developed in the course of the trial in such manner that recovery could not be had at law. In the case at bar, such transfer would require a complete change of the pleadings from a complaint and counterclaims, all asking for judgment personally against defendant or plaintiff, to a suit in equity for a winding up of the venture and an accounting. In such circumstances, a transfer is not permissible, and, while American Mills Co. v. Hoffman (C. C. A.) 275 Fed. 285, deals with a different situation, the same general principles are applicable, and, as said for this court by Rogers, J.:

' "If a party can allege one cause of action and then recover upon another, his complaint will serve no useful purpose, but rather to ensnare and mislead his adversary' * * * 'the court upon the trial is not authorized to allow an amendment which substantially changes the claim or defense, * * * and the amendment was not only a substantial change of the claim, but was a substitution of another cause of action for the one pleaded.' "

The purpose of section 274a was to obviate a new action or suit merely because the litigant had brought his suit on the wrong side of the court. This section did not mean to confer the power upon the

practice. Any party to the suit shall have the right, at any stage of the cause, to amend his pleadings so as to obviate the objection that his suit was not brought on the right side of the court. The cause shall proceed and be determined upon such amended pleadings. All testimony taken before such amendment, if preserved, shall stand as testimony in the cause with like effect as if the pleadings had been originally in the amended form."

court of transferring the cause from law to equity or equity to law, as the case might be, where so to do would require setting up an entirely different cause of action and supporting the same by an entirely different character and subject-matter of proof. The words "to conform them to the proper practice" are significant, because they indicate that Congress was dealing with a practice question, and what the Congress was endeavoring to accomplish was the avoidance of a second trial where the cause of action set up, the testimony adduced in support thereof, and the relief sought indicated that the action or suit had been brought on the wrong side of the court; but we are satisfied that this useful and remedial statute was not intended to empower the court to transfer the cause, where in order to bring it into the law or equity side, as the case might be, it would be necessary to plead an entirely different cause of action, supported by testimony wholly or in part different, and where the judgment or decree to be obtained would thus rest upon entirely different pleadings and substantially different testimony.

There is nothing to prevent either party from bringing an appropriate suit in equity, and to a court of equity upon a proper bill either party may resort, if so advised.

Judgment affirmed, except as to part of the seventh counterclaim, supra, and as to the eighth counterclaim, and in such respects reversed.